IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **SCOTT F. EASTER,** | ) | |
| **DANIEL M. EARLY,** | ) | |
| **ACS DESIGN, LLC,** | ) | |
| **APPALACHIAN TECHNOLOGY** | ) | |
| **SOLUTIONS, LLC** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| **CONTECH CONSTRUCTION** | ) | Case No. _____ |
| **PRODUCTS, INC.** | ) | |
| Serve: Registered Agent | ) | |
| CT Corporation System | ) | |
| 4701 Cox Road | ) | |
| Suite 285 | ) | |
| Glen Allen, Va 23060-0000 | ) | |
| | ) | |
| **CONTECH ENGINEERED SOLUTIONS LLC** | ) | |
| Serve: Registered Agent | ) | |
| CT Corporation System | ) | |
| 4701 Cox Road | ) | |
| Suite 285 | ) | |
| Glen Allen, Va 23060-0000 | ) | |
| | ) | |
| **Defendants** | ) | |

The Plaintiffs, Scott F. Easter (hereinafter referred to as "Easter"), Daniel M. Early (herein after referred to as "Early"), ACS Design, LLC, (hereinafter referred to as "ACS Design") and Appalachian Technology Solutions, LLC, (hereinafter referred to as "AppTech"), file this Complaint against Contech Construction Products, Inc. and Contech Engineered Solutions LLC (collectively hereinafter referred to herein as "Contech"), based on Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, Misrepresentation and

Infringement of U.S. Patent 8,372,274 pursuant to 35 U.S.C. § 284.    Plaintiffs also seek the relief afforded under the Declaratory Judgment Act, 28 U.S.C. §§2201(a), and through Rule 57 of the Federal Rules of Civil Procedure, and for the Court to issue the preliminary and permanent injunctive relief requested under Rule 65 of the Federal Rules of Civil Procedure. In support thereof, the Plaintiffs would show unto the Court the following:

## JURISDICTION AND VENUE

1.      The Plaintiffs, Easter and Early, are each citizens of the Commonwealth of Virginia.

2.      The Plaintiffs, ACS Design and AppTech, are each limited liability companies formed under the laws of the Commonwealth of Virginia.

3.      Easter and Early are the sole owners of AppTech. ACS Design is a wholly-owned subsidiary of AppTech.

4.      Upon information and belief, Contech Construction Products, Inc. ("CCPI") is, or was, an Ohio corporation.

5.      Upon information and belief, Contech Engineered Solutions LLC, is an Ohio limited liability company, and the successor in interest to CCPI (hereinafter referred to as "Contech").

6.      Upon information and belief, each of the Defendants conducts (or previously conducted) business in the Commonwealth of Virginia.

7.      Upon information and belief, each of the Defendants maintains a registered agent within the Commonwealth of Virginia.

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) as it is between citizens of different states, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

9.      In addition, the Count has jurisdiction over this matter because it arises under the patent laws of the United States, 35 U.S.C. § 1, *et seq*., including § 271.   The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§2201(a), and through Rule 57 of the Federal Rules of Civil Procedure, and to issue the preliminary and permanent injunctive relief requested under Rule 65 of the Federal Rules of Civil Procedure.

11.     Venue is proper pursuant to 28 USC § 1391.

12.     An actual controversy exists among the parties, as hereinafter set forth, which involves the interpretation of agreements, instruments of writing, various documents, statutes, other governmental regulations, and the actual antagonistic assertion and denial of rights. The Court has jurisdiction of the matters set forth herein to adjudicate certain rights and obligations between the Plaintiffs and Defendants.

## FACTUAL BACKGROUND

13.     Upon information and belief, Contech is a site solution provider for the civil engineering industry.

14.     AppTech is a water and wastewater manufacturing and engineering solutions provider to the civil engineering industry, and its principal place of business is located in Roanoke, Virginia.

15.     ACS Design is a water and wastewater engineering firm with its principal place of business located in Roanoke, Virginia.

16.     Upon information and belief, prior to August 17, 2011, Contech sold no wastewater treatment products, nor did it have any staff with adequate experience in this area.

17.     Easter and Early are both professional engineers licensed in numerous states, including without limitation, the Commonwealth of Virginia, each with over twenty years' experience primarily in the decentralized water and wastewater market.

18.     Early and Easter are the joint and exclusive owners of all right, title, and interest in certain wastewater treatment inventions (the "Wastewater Inventions").

19.     On or about November 10, 2010, the Plaintiffs met with multiple Contech (through its predecessor CCPI) representatives in Kingman, Arizona to (i) present their product lines and their vision for what steel reinforced polyethylene (hereinafter referred to herein as "SRPE") meant to the wastewater treatment industry, and to (ii) gauge Contech's interest in selling the Plaintiffs' products as a distributor.

20.     The Plaintiffs believed that Contech's SRPE products offered superior specification, and were the best alternative on the market to be used in wastewater systems that incorporate the Plaintiff's Wastewater Inventions, and were an essential element in order to reduce to practice their inventions claimed in the 274 Patent (defined below).

21.     Contech (through its predecessor CCPI) represented that it had worldwide rights to the patents covering the SRPE product.

22.     ACS Design, AppTech and Contech (through its predecessor CCPI) entered into a mutual Confidentiality Non-Disclosure Agreement on January 19, 2010, a copy of said agreement being attached hereto as "Exhibit 1" (as subsequently amended on December 30, 2010 and again on January 19, 2012, the "NDA") in order to allow the parties to continue discussions and evaluate a possible business relationship.

23.     On January 12, 2011, Easter and Early filed an application entitled "Wastewater Treatment System and Method," listing as inventors Easter and Early, with the United States Patent and Trademark Office (the "PTO") seeking protection under Title 35 of the United States Code covering their Wastewater Inventions.

24.     On February 12, 2013, the PTO duly and legally issued United States Patent No. 8,372,274 (the "274 Patent"), entitled "Wastewater Treatment System and Method," listing as inventors Easter and Early, based upon their Wastewater Inventions, after a full and fair examination. A true and correct copy of the 274 Patent is attached as "Exhibit 2".

25.     In the spring of 2011, Easter and Early continued discussions with Contech (through its predecessor CCPI) concerning a number of business opportunities, including, without limitation, the ability of Easter and Early to purchase Contech's SRPE raw materials.

26.     Based on their market assessment, Contech (through its predecessor CCPI) represented to Plaintiffs that its worldwide distribution of products, incorporating the Plaintiffs Wastewater Inventions, could potentially result in billions of dollars in sales.

27.     Contech represented that its existing sales force comprised of approximately 300 outside sales engineers, including over 100 project consultants, with approximately $700,000,000 in annual sales in prior years.

28.     Prior to 2012, Contech's project consultants were responsible for front end promotion of all Contech's products.

29.     In order to induce the Plaintiffs to agree to grant the exclusive licenses in the License Agreement (defined below), Contech (through its predecessor CCPI) represented that it would commit substantial effort, funds and other resources to commercialize systems using the

Wastewater Inventions, both through its own dedicated resources, and through various collaborations with third parties.

30.     Contech (through its predecessor CCPI) represented that it would support its new product commercialization efforts by making ongoing, substantial expenditures and investments.

31.     Contech (through its predecessor CCPI) represented to the Plaintiffs that it would use substantial efforts, spend significant funds, and use other resources to recruit and retain high-quality engineers, wastewater specialists and other personnel with wastewater treatment expertise.

32.     During a meeting in West Chester, Ohio, in March, 2011, while negotiating the terms of the License Agreement (defined below), Contech (through its predecessor CCPI) threatened to refuse to sell its SRPE Pipe to AppTech, and to work around Easter and Early's patents, unless Plaintiffs agreed to their terms.

33.     On August 17, 2011, Easter, Early, and Contech (through its predecessor CCPI), entered into a number of agreements (directly and indirectly) as follows:

> A.     Easter and Early entered into a License Agreement with Contech (through its predecessor CCPI), a copy of said agreement being attached hereto as "Exhibit 3" (as amended on July 31, 2013, the "License Agreement").
>
> B.     ACS Design entered into a Design Services Agreement with Contech (through its predecessor CCPI), a copy of said agreement being attached hereto as "Exhibit 4" (as amended on October 31, 2011 and again on December 5, 2011, the "Design Services Agreement").
>
> C.     AppTech entered into a Marketing Agreement with Contech (through its predecessor CCPI), a copy of said agreement being attached hereto as "Exhibit 5" (as amended on July 31, 2013, the "Marketing Agreement").
>
> D.     Contech (through its predecessor CCPI), Early and Easter executed a SRPE supply letter dated August 17, 2011, a copy of said letter being attached hereto as "Exhibit 6" (the "Supply Letter").

34.     On January 23, 2012, Contech (through its predecessor CCPI) provided a list of foreign countries that Contech intended on filing and maintaining registrations covering Easter and Early's Wastewater Inventions, a copy of which is attached hereto as "Exhibit 7".

35.     On May 30, 2012, AppTech, a third party Plastic Fabricating, Inc. ("PFI"), and Contech (through its predecessor CCPI) entered into a Consignment Agreement, a copy of said agreement being attached hereto as "Exhibit 8" (the "Consignment Agreement", and together with the License Agreement, the Design Services Agreement, the Marketing Agreement, the Supply Letter and the NDA, the "Transaction Documents").

36.     The overall purpose of the Transaction Documents was, *inter alia*:

      A.     to create a relationship whereby AppTech would have continuing rights to purchase and use Contech's SRPE product;

      B.     grant Contech certain non-exclusive rights to market and distribute wastewater systems utilizing the Wastewater Inventions in the Commonwealth of Virginia (later amended to include the State of West Virginia);

      C.     grant Contech certain exclusive rights to manufacture, market and distribute wastewater systems utilizing the Wastewater Inventions worldwide excluding the Commonwealth of Virginia (later amended to include the State of West Virginia);

      D.     provide support to Contech in order to license standard product designs and related manuals for systems incorporating the Wastewater Inventions;

      E.     provide Contech engineering support during the time that Contech hired its own qualified staffing; and

      F.     agree to cooperatively market the Magellan product in the Commonwealth of Virginia.[1]

37.     Under the terms of the License Agreement, Easter and Early granted to Contech a royalty bearing, exclusive, nontransferable, license to make, have made, use, market, offer to

---

[1]     The Contech systems incorporating the Wastewater Inventions were branded, trademarked and marketed by Contech as the "Magellan" product.

sell, sell and import Licensed Systems (as defined therein) worldwide, but excluding the Commonwealth of Virginia.

38.     In exchange, Contech agreed in the License Agreement to "use commercially reasonable efforts consistent with the introduction of new product lines and any limits resulting from Third Party proprietary rights, to market and sell Licensed Systems in an effort to maximize revenues and royalties payable to Easter and Early from sales of Licensed Systems in the Exclusive Territory" (defined therein).

39.     The royalty sharing arrangement in the License Agreement contemplated royalties as follows:

"(a)     six percent (6) of Net Sales (defined in the License Agreement) for the first ten million dollars in lifetime cumulative Net Sales (US $0 to $10,000,000);

(b)     five percent (5) of Net Sales for the second ten million dollars in lifetime cumulative Net Sales (US$10,000,001 to US$20,000,000);

(c)     four percent (4) of Net Sales for the third ten million dollars in lifetime cumulative Net Sales (US$20,000,001 to US$30,000,000);

(d)     three percent (3) of Net Sales for lifetime cumulative Net Sales in excess of thirty million dollars and up to seventy million dollars (US$30,000,001 to US$70,000,000); and

(e)     two and one-third percent (2.33) of Net Sales for lifetime cumulative Net Sales in excess of seventy million dollars (US$70,000,001 +)."

40.     On or about late August 2011, Contech assigned one of its existing employees as the product manager for wastewater treatment, Mr. Andrew Jenkins (hereafter referred to as "Jenkins").

41.     At the time of his appointment, Jenkins had no education or experience in the wastewater treatment industry.

42.     For the period beginning on or about August of 2011, until June of 2014, Contech failed to hire a single capable experienced wastewater engineer to assist with the normal day to day operations of the Magellan product line.

43.     Contech failed to develop meaningful manufacturing protocols, and failed to make any meaningful investment in its manufacturing processes, equipment, and tooling required to support early stage Magellan production.

44.     Contech failed to exert any effort to plan, invest, and provide manufacturing capabilities during 2011 and 2012 resulting in the need to outsource Magellan manufacturing to AppTech for its initial orders.

45.     Contech did not commence producing Magellan products in-house until early 2013.

46.     In addition to acting as the wastewater treatment product manager, Jenkins was charged with product management of other Contech plastic products, therefore, further diminishing his ability to execute on the wastewater treatment products and services.

47.     With Jenkins appointment, along with the lack of assigning and/or hiring other dedicated and qualified personnel, the Plaintiffs realized that Contech neither had the experience in launching new product lines in the wastewater treatment industry, nor the desire to invest in the recruitment of experienced engineers, wastewater specialists, or product management.

48.     Contech made representations to the Plaintiffs that it would invest, and further develop and promote the product utilizing its considerable corporate resources, as set forth herein.

49.     After signing the Transaction Documents, AppTech made repeated attempts in writing, phone calls, and emails to encourage Contech to invest in the recruitment of experienced

engineers, wastewater specialists, and product management in order to take advantage of the market opportunity.

50.     Contech failed to develop any meaningful digital marketing campaign around its wastewater treatment solutions.

51.     Contech failed to develop any meaningful conventional marketing campaign around its wastewater treatment solutions, such as print or targeted mass marketing campaigns.

52.     Contech failed to develop, or engage, in any significant number of channel partners in order to help distribute its wastewater treatment products.

53.     Contech never used its field project consultants, or its sales engineers, to create awareness of the Magellan product line outside of the Commonwealth of Virginia and the State of West Virginia.

54.     Contech never modified its sales commission plan in order to provide incentives to its field project consultants, or its sales engineers to promote, and sell the Magellan product lines.

55.     In 2012, the ownership of CCPI was sold to a third party, who reorganized the organization structure of Contech, which had the effect to further reduce the focus on the Magellan product line.

56.     This ownership reorganization resulted in changing the promotion focus of Contech's field project consultants to specific products rather than Contech's entire portfolio of products.

57.     All field project consultants now focused solely on Contech's stormwater products or its bridge products, and none were dedicated to wastewater treatment products.

58.     On or about August 2012, Contech commissioned AMG Research to develop a "Decentralized Wastewater Treatment Market Study".

59.     The Decentralized Wastewater Treatment Market Study estimated the 2012 market opportunity for Licensed Systems (as defined in the License Agreement) to be between $335 million and $410 million, a copy of which is attached hereto as "Exhibit 9".

60.     On or about November 2011, Contech hired Mr. Lance Jackson (hereafter referred to as "Jackson") as a wastewater specialist.

61.     Jackson was hired to be the specialist in the Commonwealth of Virginia, but was later assigned to a national role.

62.     Jackson was the only hire ever made by Contech as a wastewater specialist.

63.     Jackson was the only Contech employee responsible for tracking sales leads, new project opportunities, supporting consulting engineers, quoting projects to customers, and securing purchase orders for Magellan projects.

64.     In addition, Jackson was responsible for managing the projects once delivered to the site, and coordinating startups/training and field repairs with Falwell Resource Group (FRG).

65.     FRG is a third party field support service company located in Lynchburg, Virginia introduced to Contech by AppTech.

66.     Jackson was never provided any pricing and proposal tools from Contech, despite repeated requests.

67.     The only pricing and proposal tools Jackson had at his disposal were those developed solely by AppTech.

68.     Contech never provided Jackson with a wastewater engineer to provide technical support, or in-house engineering support, to properly respond to customer's project requirements.

69.     Jackson had to use the Plaintiffs' pricing and proposal tools in his attempts to market the Magellan products.

70.     On numerous occasions, AppTech offered to provide technical support directly to Contech, but those requests were denied by Contech.

71.     Jackson understood the importance of critical technical support and routinely requested that Contech engage the Plaintiffs on an exclusive contractual basis whereby Contech could leverage the Plaintiff's intimate knowledge of the Magellan product. Each and every request was denied by Contech.

72.     At that point, it became clear to the Plaintiffs that Contech had no plans to hire additional people, or resources, to support its new wastewater treatment product line.

73.     It was unreasonable to task one individual with the responsibilities given to Jackson and expect the Magellan Product line to undergo any growth, or increase sales that were contemplated in the License Agreement.

74.     Jackson's employment with Contech was terminated by Mr. Tom Slabe, President Engineered Solutions, on August 13, 2014.

75.     Jackson's dependence on the Plaintiffs was a contributing factor, if not the sole factor, in Jackson's dismissal, or firing, by Contech.

76.     No replacement for Jackson has been hired or, to the best of Plaintiffs' knowledge, planned.

77.     For the period from August of 2011, until June 30, 2012, total sales of the Magellan products equaled approximately $270,000 representing four projects (the "First Year Sales"),

78.     Two of the four projects comprising the First Year Sales were located, originated and developed in Virginia.

79.     The First Year Sales were so far below expectations because Contech failed to devote the proper resources consistent with the introduction of a new product line.

80.     In August of 2012, and with no credible product sales successfully accomplished to that date, Early and Easter submitted a written assessment of Contech's progress on or about August 22, 2012, a copy of which is attached hereto as "Exhibit 10", in which it made simple and clear recommendations on how Contech could begin to meet its contractual commitments. These recommendations were rejected by Contech.

81.     The Plaintiffs offered to work under contract for Contech for a two year period in which they would leverage their considerable knowledge and product specific experience in a subordinate role to help promote and further the Magellan product.  This offer was rejected by Contech (See Exhibit 10).

82.     Contech utilizes the Microsoft Dynamics CRM to price, track, and process all sales across its entire portfolio of products.

83.     The Microsoft Dynamics CRM is a fundamental component of all Contech sales.

84.     The Magellan product line was not added to Contech's Microsoft Dynamics CRM until on or about August of 2013.

85.     When finally added to the Contech's Microsoft Dynamics CRM in August of 2013, Contech added the product portfolio in name only, and did not, and has not developed any CRM pricing, or sales execution capabilities within the Microsoft Dynamics CRM.

86.     Contech failed to include the Magellan product, part number, and pricing within Contech's Microsoft Dynamics CRM, which would normally be done with the introduction of a new product line.

87.     For the period from July of 2012 until June 30, 2013, total sales of the Magellan products equaled approximately $460,000 representing four projects (the "Second Year Sales"),

88.     Three of the four projects comprising the Second Year Sales originate from projects in Virginia and West Virginia.

89.     The Second Year Sales were so far below expectations because Contech failed to devote the proper resources consistent with the introduction of a new product line.

90.     Beginning in mid-2013, Easter and Early began providing direct sales and engineering support to project engineers and owners in order to generate sales due to the lack of sales being generated by Contech.

91.     In July of 2013, Contech assigned its wastewater treatment division to Mr. Tom Slabe.

92.     The Plaintiffs had no communication with Mr. Slabe until December of 2013.[2]

93.     At all times herewith concerned the Magellan products that Contech produced suffered significant quality control problems in fabrication.

94.     A meeting was held on or about January of 2014 in Montgomery, Alabama, to address, *inter alia*, the quality control issues in the manufacturing and fabrication of the Magellan product.

---

[2]     Mr. Tom Slabe, had admitted on multiple occasions to the Plaintiff that he has given the wastewater treatment division little to no attention due to the fact that he is managing numerous other established divisions, most notably the stormwater division. Mr. Slabe also admitted on multiple occasions that Jenkins was not qualified for the position he held of Director, Wastewater Treatment but held him in that leadership position.

95.     During that meeting in Montgomery, Alabama, Plaintiffs made a number of fabrication recommendations, all of which were rejected, or ignored, by Contech.

96.     Magellan units continued to be shipped to the customers as incomplete systems, that either delayed final installation at cost to the installation contractor or customer, and/or delayed final distribution of royalties payable to the Plaintiffs.

97.     Contech consistently had significant fabrication issues with the Magellan products.

98.     A representative September 2014 field report, noting significant fabrication issues for recently installed Magellan products, is attached hereto as "Exhibit 11".

99.     For the period from July 2013 until June 30, 2014, total sales of the Magellan products equaled approximately $1,380,000 (the "Third Year Sales").

100.    Approximately fifty percent (50%) of the Third Years Sales was attributed to the efforts of the Plaintiffs and not Contech.

101.    The Third Year Sales were far below expectations because Contech again failed to devote the proper resources consistent with the introduction of a new product line.

102.    All Fourth Years Sales prior to August 21, 2014 have been the result of the efforts of the Plaintiffs and not Contech.

103.    All current Fourth Years Sales were initiated under the terms of the agreed to Fiscal Year 2014 Annual Sales Plan between Contech and AppTech, a copy of which is attached hereto as "Exhibit 12".

104.    In 2014, Contech informed the Plaintiffs that Contech possessed exclusive rights to the patents covering the SRPE material only in North America, even though the Transitional

Documents were entered into based upon Contech's representations that it had worldwide rights to the SRPE.

105.    Contech has not sold a single wastewater treatment system, nor done any promotional effort outside of the continental United States, despite having an exclusive worldwide license to the Wastewater Inventions.

106.    Contech contends that the Plaintiffs do not have the rights to market their products using SRPE in countries outside the United States.

107.    Contech failed to develop a single credible engineering system, detail, or process that is routinely a part of the development of a new product like Magellan.

108.    Contech failed to implement any three-dimensional modeling of the Magellan products in support of engineering, marketing, and sales.

109.    Three dimensional modeling is the standard by which all new products are developed and introduced into the market place.

110.    Contech routinely failed to produce complete and accurate shop drawings in support of manufacturing, resulting in defective products as described herein.

111.    Prior to signing of the Transitional Documents, AppTech generated sales over a fifteen month period of $1,042,526 for systems utilizing the Wastewater Inventions.

112.    Since the signing of the Transaction Documents, Contech's combined three year sales for the Magellan products were a mere $2,106,448 utilizing the Wastewater Inventions.

113.    A significant portion of Contech's Magellan product sales were attributed to the efforts of the Plaintiffs.

114.    Contech has failed to exert even the slightest level of effort to generate or improve the dismal sales performance of the Magellan products.

115.    Contech has failed to live up to its obligations in the License Agreement and has been unwilling to use commercially reasonable efforts consistent with the introduction of a new product line during the entire time of the License Agreement.

116.    Contech has failed to provide meaningful support in key areas, such as hiring individuals with wastewater treatment expertise.

117.    Contech has failed to use its existing sales force to promote the Magellan products, which Contech represented it would do when negotiating the Transaction Documents.

118.    Contech rejected every offer of Plaintiffs to assist Contech.

119.    Even though Contech employed hundreds of employees in the support of its other products, Contech's wastewater treatment staff as of August 21, 2014 consisted of only four individuals.

120.    At all times relevant, Contech had no wastewater project consultants or wastewater specialists other than Jackson for the Magellan products.

121.    Upon review of all the facts and circumstance, Contech has failed to live up to its obligations in the License Agreement, and has been unwilling to use commercially reasonable efforts consistent with the introduction of a new product line during the entire time of the License Agreement.

122.    By letter dated August 21, 2014, the Plaintiffs, through counsel, notified Contech, *inter alia*, that the Plaintiffs had terminated the License Agreement effective immediately. A copy of that termination notice is attached hereto as "Exhibit 13".

123.    Upon information and belief, and notwithstanding the termination of the License Agreement, Contech continues to sell and offer to sell the Magellan products that incorporate the Plaintiffs Wastewater Inventions.

124.    Upon information and belief, and notwithstanding the termination of the License Agreement, Contech continues to sell and offer to sell the Magellan products that incorporate the claims under the 274 Patent, and the Wastewater Inventions.

125.    Upon information and belief, following the termination of the License Agreement, Contech entered into an agreement for the sale of its Magellan products, which incorporate claims under the 274 Patent, and the Wastewater Inventions, in connection with the project known as Lime Springs Beef in Iowa.

126.    Upon information and belief, Contech attended the 2014 annual Water Environment Federation's Annual Technical Exhibition and Conference in New Orleans, LA

127.    Upon information and belief, following the termination of the License Agreement, Contech promoted the Magellan products that incorporate claims under the 274 Patent, and the Wastewater Inventions at the 2014 annual Water Environment Federation's Annual Technical Exhibition and Conference.

## COUNT I

## DECLARATORY JUDGMENT

128.    The Plaintiffs repeat and re-allege each allegation set forth in Paragraphs 1 through 127.

129.    There is an actual, substantial and continuing controversy between the Plaintiffs and the Defendants and a declaration of rights is both necessary and appropriate to establish the termination of the License Agreement and to allow the Plaintiffs' to leverage and exploit its inventions claimed under the 274 Patent, and its other intellectual property.

130.    Declaratory judgments should be liberally granted for the purpose of affording a speedy and inexpensive method of adjudicating legal disputes and to settle legal rights and remove uncertainty and insecurity from legal relationships.

131.    The Plaintiffs allege, and the Defendants deny, that the Defendants' have so materially and utterly failed to live up to its obligations under the License Agreement, that the Plaintiffs are entitled, and have in fact, terminated the License Agreement in accordance with the terms thereunder.

132.    The Plaintiffs' are being injured by the Defendants' insistence of the continuing enforceability of the License Agreement and its exclusive right in and to the inventions claimed under the '274 Patent, which is causing significant confusing and disruption in Plaintiffs' addressable market.

133.    Plaintiffs injury can be redressed by the relief requested: a declaratory judgment that the License Agreement is terminated.

134.    Plaintiffs hereby request declaratory relief under 28 U.S.C. §§2201(a), and respectively requests that this Court determine the rights and/or other legal relations of the parties.

## COUNT II

## BREACH OF CONTRACT

135.    The Plaintiffs repeat and re-allege each allegation set forth in Paragraphs 1 through 134.

136.    Pursuant to the License Agreement, Early and Easter agreed to grant to Contech certain exclusive rights with respect to their Wastewater Inventions.

137.    In exchange for the exclusive rights in the License Agreement, Contech agreed to use commercially reasonable efforts, consistent with the introduction of new product lines and any limits resulting from third party proprietary rights, to market and sell systems incorporating the Plaintiffs' Wastewater Inventions in an effort to maximize revenues and royalties payable to Easter and Early.

138.    Contech breach its obligations in the License Agreement to use commercially reasonable efforts to market, and sell systems incorporating the Plaintiffs' Wastewater Inventions.

139.    As a result of such failure, the Plaintiffs have suffered damages in the amount of $25,000,000.

## COUNT III

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

140.    The Plaintiffs repeat and re-allege each allegation set forth in Paragraphs 1 through 139.

141.    A duty of good faith and fair dealing is implied in the License Agreement.

142.    For all relevant periods, Contech prioritized its storm water and bridge products and services to the detriment of its Magellan products.

143.    The duty of good faith and fair dealing required Contech to refrain from operating its business in order divert its resources to its other product lines to the detriment of its Magellan products.

144.    Contech breached its duty of good faith and fair dealing by failing to support its Magellan line of business in the same manner that it supported its storm water and bridge business.

145.    As a result of Contech's breach of its duty of good faith and fair dealing, the Plaintiffs have suffered damages in the amount of $25,000,000.

## COUNT IV

### MISREPRESENTATION

146.    The Plaintiffs repeat and re-allege each allegation set forth in Paragraphs 1 through 145.

147.     As a claim in the alternative, the Plaintiffs allege that Contech made a number of misrepresentations or omissions of material facts, and such facts were communicated by Contech to the Plaintiffs with the knowledge that the Plaintiffs would rely upon them in signing the License Agreement and the other Transaction Documents.

148.     The Plaintiffs were not aware of the alleged misrepresentations and/or omissions in the License Agreement, and could not reasonably have discovered them.

149.     Contech had a continuing duty of disclosure to the Plaintiffs about Contech intentions to support the Magellan line of business.

150.     Based on the Plaintiffs' detrimental reliance upon the misrepresentations and omissions as alleged above, the Plaintiffs are entitled to damages from Contech equal to $25,000,000.

## COUNT V

## INFRINGEMENT OF U.S. PATENT 8,372,274

151.     The Plaintiffs re-allege each allegation set forth in Paragraphs 1 through 150.

152.     Easter and Early are the inventors and owners of the 274 Patent, including all rights to recover for past and future acts of infringement.

153.     Contech is liable for direct infringement of the 274 Patent pursuant to 35 U.S.C. § 271(a).

154.     Contech has directly infringed and continues to directly infringe, either literally or under the doctrine of equivalents, at least Claim 1 of the 274 Patent by making, using, selling, and/or offering to sell in the United States, or importing into the United States, certain methods and/or systems disclosed and claimed in the 274 Patent, specifically including, but not limited to, its Magellan products.

155.    Contech has induced its customers and users of its Magellan products to infringe the 274 Patent literally and/or under the doctrine of equivalents by providing instructions to practice the methods of the 274 Patent.

156.    Contech has had knowledge of the 274 Patent and evidence of its infringement of the 274 Patent since at least the date Contech was notified of the termination of the License Agreement.

157.    The Plaintiffs notified Contech that making, using, selling, and/or offering to sell any Magellan product in light of the termination of the License Agreement would be an infringement of the 274 Patent.

158.    On information and belief, Contech acted with the specific intent to induce its customers to use the methods claimed by the 274 Patent by continuing the above-mentioned activities with knowledge of the 274 Patent.

159.    The Plaintiffs have suffered and continue to suffer damages as a result of Contech's infringement of the 274 Patent.

160.    Pursuant to 35 U.S.C. § 284, the Plaintiffs are entitled to recover damages from Contech for its infringing acts in an amount subject to proof at trial, but no less than a reasonable royalty from Contech for its infringing acts.

161.    Contech's infringement of the Plaintiffs' 274 Patent has damaged and will continue to damage the Plaintiffs, causing irreparable harm for which there is no adequate remedy at law, unless Contech is enjoined by this Court.

**WHEREFORE**, the Plaintiffs respectively request that the Court grant the relief herein requested as follows:

A.  That Plaintiffs are entitled to a Preliminary and Permanent Injunctive Relief to enjoin Contech from manufacturing or selling product that infringe upon Plaintiffs' 274 Patent;

B.  That the Court find that Contech is liable for damages in at least Twenty-Five Million Dollars ($25,000,000.00) for breach of contract and patent infringement, and that the Court award the Plaintiffs a trial by jury;

C.  That the Court find that the Plaintiffs are entitled to an award of attorney's fees and costs; and

D.  Such other and further relief as the Court deems appropriate.

Trial by jury is Demanded.

Respectfully Submitted,

Scott F. Easter
Daniel M. Early
ACS Design, LLC
Appalachian Technology Solutions, LLC

By:    S/ B. K. Cruey
          Counsel

B. K. Cruey, Esquire
6686 Roanoke Road
P.O. Box 491
Shawsville, Virginia 24162
VA Bar No. 03349
Tel. 540-268-2002
          Counsel for Plaintiffs